THIRD DIVISION

                                        April 16, 1997

1-94-2763)

1-95-0350) consolidated

DUANE F. AMATO,                         )    Appeal from

                                   )    the Circuit Court

     Plaintiff-Appellant,               )    of Cook County.

                                   )    

          v.                       )

                                   )

PASTOR VERNON C. GREENQUIST, an         )

individual, BISHOP SHERMAN HICKS, an    ) 

individual, METROPOLITAN CHICAGO SYNOD  )

OF THE EVANGELICAL LUTHERAN CHURCH OF   )

AMERICA, an Illinois not-for-profit          ) 

corporation, EVANGELICAL LUTHERAN       ) 

CHURCH IN AMERICA a/k/a ELCA, a foreign )  

not-for-profit corporation, and PEACE   )    

LUTHERAN CHURCH OF LAKE ZURICH, an      )    

Illinois not-for-profit corporation,    )    The Honorable

                                   )    Kenneth Gillis,     

     Defendants-Appellees.              )    Judge Presiding.

     Justice Leavitt delivered the opinion of the Court:

     Until late 1990, the plaintiff, Duane Amato, had thought

himself a happily married man.  According to a complaint he

filed, he and his wife, Linda, had been married for eighteen

years and had two children.  In 1987, the Amatos joined Peace

Lutheran Church of Lake Zurich (Peace), a fledgling parish headed

by the defendant, Pastor Vernon C. Greenquist.  The Amatos became

active in the church, and in October 1990, Linda began "faith

counseling" with Pastor Greenquist.  During November 1990, the

plaintiff and Linda began experiencing marital problems which

were accompanied by a "religious transformation" within her. 

Unbeknownst to Duane, during the course of faith counselling,

Linda had begun an affair with Pastor Greenquist, who was also

married.  On December 22, the plaintiff sought and began a course

of counselling with Greenquist.  Greenquist obliged Duane's 

request for counselling without informing him of the continuing

affair with Linda.

     Duane discovered the relationship between Greenquist and

Linda on February 15, 1991.  He notified church authorities,

including the defendant, Bishop Sherman Hicks, who was

Greenquist's immediate superior within the church hierarchy. 

Bishop Hicks suspended Greenquist, and Greenquist resigned his

position with Peace.  Bishop Hicks also suggested that Duane seek

professional counselling.  Soon after, Linda filed for a divorce

from the plaintiff.  Greenquist divorced his wife.  Greenquist

and Linda are now married.  

     The plaintiff's initial multi-count complaint against

Greenquist alleged intentional infliction of emotional distress,

breach of a fiduciary duty, clergy malpractice and common law

fraud.  He also sued Bishop Hicks, alleging breach of a fiduciary

duty and clergy malpractice.  Finally, alleging respondeat

superior, he sued Peace and the institutional hierarchy of the

Lutheran church, which consists of the Evangelical Lutheran

Church in America (ELCA) and the Metropolitan Chicago Synod of

the Evangelical Lutheran Church of America (Met Synod)

(collectively the "church defendants").

     Pursuant to motions filed by all of the defendants pursuant

to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615

(West 1994)), the trial judge dismissed most of the counts for

varying reasons stemming from the plaintiff's failure to state

causes of action, but most particularly because (1) Illinois does

not recognize the tort of clergy malpractice; and (2) the

relationship between cleric and parishioner is not a fiduciary

one.  The trial judge granted the plaintiff leave to amend, and

he filed a second amended complaint consisting of 14 counts

restating many of the same allegations, except that he

denominated the clergy malpractice claims against Greenquist and

Bishop Hicks as "psychotherapy malpractice (gross negligence)."

     The church defendants and Bishop Hicks renewed their section

2-615 motions to dismiss, and the trial judge granted them in

their entirety, dismissing 10 of the 14 counts of the complaint. 

Pastor Greenquist also renewed his section 2-615 motion to

dismiss, and in a separate order the trial judge dismissed, with

prejudice, all of the counts against him with the exception of

that alleging common law fraud.  The judge entered findings

pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)),

and the plaintiff seeks to overturn the dismissal, contending

that he has alleged facts sufficient to withstand a motion to

dismiss as to each of the counts dismissed.

     Because the counts at issue were dismissed pursuant to

section 2-615, we review the allegations of the complaint de novo

accepting as true all well-pleaded allegations and drawing all

reasonable inferences in a light most favorable to the plaintiff. 

T & S Signs, Inc. v. Village of Wadsworth, 261 Ill. App. 3d 1080,

1083, 634 N.E.2d 306 (1994).  We will uphold the dismissal only

if "it clearly appears that no set of facts can be proved" which

will entitle the plaintiff to recover.  People ex rel. Daley v.

Datacom Systems Corp., 146 Ill. 2d 1, 11, 585 N.E.2d 51 (1991). 

Additional allegations pertinent to this appeal are as follows.

     ELCA is "a nationwide organization of churches of the

Lutheran faith."  Met Synod is "the local administrative 'branch'

of the ELCA and directly oversees the operation and function of

ELCA churches in the Chicago *** area, including PEACE."  Bishop

Hicks is the Met Synod's principal cleric.  He oversees the

operations of local ELCA churches in Chicago.

     Greenquist received his training as a minister and

counsellor through ELCA.  In 1990, he had approximately 11 years

experience in preaching and counselling.  His professional

counselling experience included marriage counselling, faith

counselling and general family counselling.  Greenquist "held

himself out as a skilled professional *** in matters of

counselling."  He, along with Peace and Met Synod, "encouraged

[congregants] to seek counselling from the church and its clergy

before seeking secular professionals in order 'to promote unity,

closeness and interdependence within members of the congregation'

(in accordance with stated church doctrine)."  Furthermore,

Greenquist "was acting within the scope and parameters of his

employment duties on behalf of [the church defendants] and in

furtherance of stated church doctrine when he counselled" the

plaintiff. 

     When the plaintiff first approached Greenquist regarding

marriage counselling, he had no knowledge of the ongoing

relationship between Linda and Greenquist.  Greenquist neither

referred the plaintiff to an independent counsellor nor indicated

that he would be unable to render "objective professional

assistance."  Rather, he "welcomed the opportunity to counsel

[the plaintiff] in order to further his own personal goals *** to

foster and promote his own sexual gratification, and to further

undermine the marital relationship of" the Amatos.  Furthermore,

Greenquist revealed to Linda confidences he learned from the

plaintiff during the counselling sessions in order to foster his

relationship with Linda.

     On March 5, 1991, the plaintiff advised Bishop Hicks of the

circumstances.  The plaintiff made an appointment for

"counselling" with the Bishop.  Linda accompanied him to this

session.  The plaintiff alleged that this session constituted

"professional counselling."  However, he also alleges that the

Bishop counselled him "in furtherance of church doctrine."  The

Bishop acted merely to protect the interests of the church.  He

"took no steps to remedy the situation" and "made no effort to

save the marriage."  Rather, he "counselled that [the plaintiff]

should get further 'professional' counselling but that Linda did

not need professional counselling because she 'had close

spiritual friends she could pray with."  

     In recent years, an increasing number of cases have been

brought by laity against clergy alleging abuse of the cleric-

parishioner relationship.  The plaintiffs in these cases

generally have denominated their claims "clergy malpractice." 

Our courts have refused to entertain such claims because the

first amendment's free exercise clause prohibits courts from

considering claims requiring the interpretation of religious

doctrine.  Baumgartner v. First Church of Christ, Scientist, 141

Ill. App. 3d 898, 904-906, 490 N.E.2d 1319 (1986).  To permit

claims for clergy malpractice would require courts to establish a

standard of reasonable care for religious practitioners

practicing their respective faiths, which necessarily involves

the interpretation of doctrine.  Baumgartner, 141 Ill. App. 3d at

906.

     Nonetheless, when doctrinal controversy is not involved in a

dispute between a claimant and a church, the first amendment does

not require judicial deference to religious authority.  Bivin v.

Wright, 275 Ill. App. 3d 899, 903, 656 N.E.2d 1121 (1995).  For

instance, "in disputes over church property, Illinois courts have

applied a 'neutral principles of law' approach, objectively

examining pertinent church characteristics, constitutions and

bylaws, deeds, State statutes, and other evidence to resolve the

matter the same as it would a secular dispute ***, using purely

secular analyses without relying on religious precepts."  Bivin,

275 Ill. App. 3d at 903.

     Applying these principles, the court in Bivin reinstated a

claim of negligent supervision against a church brought by a

husband and wife who had sued their reverend, the reverend's

superior and the church, alleging that during the course of

marital counselling, the reverend entered into a sexual

relationship with the wife which exacerbated the marital

problems.  The court noted that "the church defendant does not

claim that the alleged sexual misconduct of its minister was part

of its religious beliefs or practices or was in any way

sanctioned by the church."  Bivin, 275 Ill. App. 3d at 902. 

Thus, the court held that it could "not conclude from plaintiffs'

complaint that their cause of action *** will infringe upon, or

place a burden upon, the church's freedom to exercise its

religion."  Bivin, 275 Ill. App. 3d at 903.

     The decision in Bivin clarifies that Illinois courts may

entertain lawsuits alleging tortious conduct by churches and

their employees, so long as the resolution does not require

interpretation of either religious doctrine or religious duties

imposed on an individual by a particular church.  We believe the

approach announced in Bivin reflects a reasoned approach to

determining the justiciability of disputes of this nature.  It is

also the approach which other jurisdictions have adopted in

assessing the particular type of claims raised by the plaintiff

in this case.  

     In F.G. v. MacDonell, 677 A.2d 258, 264 (N.J. Super. A.D.

1996), the court permitted a claim of negligent pastoral care and

counselling against a cleric-counsellor who had "used his

position to sexually exploit the counsellee."  In so holding, the

court recognized the constitutional limitations on the judiciary

in such disputes, but nonetheless stressed that whether such a

claim is cognizable requires a determination that the court will

not need to evaluate "dogma or ritual, or other matters of

ecclesiastical concern."  MacDonell, 677 A. 2d at 263.  Likewise,

the Colorado Supreme Court has recognized that in the context of

spiritual counselling, the free exercise clause is relevant only

if the defendant can show that the conduct that allegedly caused

plaintiff's distress was in fact part of the belief and practices

of the religious group."  DeStefano v. Grabrian, 763 P.2d 275,

283-84 (Colo. 1988).  See also Sanders v. Casa View Baptist

Church, 898 F. Supp. 1169, 1174 (N.D.Tex. 1995).  Accordingly,

one court has observed that clerics cannot, using the shield of

the first amendment, "masquerade[] in the form of marriage

counsel[lors]" and then "prey" on a counsellee.  Sanders, 898 F.

Supp. at 1175.

     The plaintiff contends that he has properly pled claims of

"psychotherapy malpractice" against both Pastor Greenquist and

Bishop Hicks.  The defendants contend that these counts merely

restate the allegations of the clergy malpractice claim

previously dismissed by the trial judge -- claims the plaintiff

concedes are not cognizable in an Illinois court.  Although we

acknowledge that the second amended complaint is not, in

substance, radically different from the one previously dismissed,

we will not determine the justiciability of these counts based

upon the nomenclature used by the plaintiff in entitling the

counts.  That is, if the plaintiff's allegations, as a whole, can

be fairly construed as claims of negligence directed at conduct

other than the defendants' performance of their clerical duties,

his claims must be reinstated.  See 735 ILCS 5/2-612 (West 1994)

("No pleading is bad in substance which contains such information

as reasonably informs the opposite party of the nature of the

claim.")  On the other hand, if the factual allegations of the

claims lead only to the conclusion that they allege malpractice

by the defendants in their practice as members of the clergy,

that would require us to adjudicate them pursuant to a reasonable

cleric standard, hence rendering them non-justiciable as in

Baumgartner.

     The plaintiff's complaint clearly alleges that the plaintiff

sought marital counselling from Pastor Greenquist and that

Greenquist held himself out as a professional counsellor.  Yet,

the complaint also states that Greenquist "encouraged

[congregants] to seek counselling from the church and its clergy

before seeking secular professionals in order 'to promote unity,

closeness and interdependence within members of the congregation'

(in accordance with stated church doctrine)."  Furthermore,

Greenquist "was acting *** in furtherance of stated church

doctrine when he counselled" the plaintiff.  The plaintiff then

lodges six specific charges against Pastor Greenquist, all

premised on the allegation that the Pastor "failed to exercise

ordinary care" and "wilfully defrauded and deceived" the

plaintiff.  According to the complaint the Pastor (1) co-

conspired with the plaintiff's wife to undermine the marriage;

(2) did not divulge his conflict of interest; (3) failed to refer

the plaintiff to a neutral counsellor; (4) rendered bad advice to

further his own goals and sexual gratification; (5) divulged

confidences to Linda; and (6) disregarded "all indicia of the

transference and countertransference phenomena which normally

occurs in the course of psychotherapy."

     We note, initially, that each of these allegations are

based, in part, on an underlying allegation of fraud.  The trial

judge has permitted the plaintiff to replead a separate fraud

count, the allegations of which essentially duplicate the ones

above.  Fraud is a distinct cause of action in Illinois.  To that

extent, we do not believe the allegations of fraud are germane to

a count alleging professional negligence, be it that of a

psychotherapist or a cleric.  Cf. Williams v. Chicago Osteopathic

Health Systems, 274 Ill. App. 3d 1039, 1048, 654 N.E.2d 613

(1995) (recognizing differing elements and standard of proof

between medical malpractice and fraud.)  Therefore, we address

the count for malpractice solely to the extent it alleges that

the Pastor breached a duty of care owed to the plaintiff.

Furthermore, the allegation regarding the Pastor's conspiracy

with Linda also has nothing to do with the Pastor's counselling

relationship with the plaintiff, and, hence, we find that it

fails to state a claim for professional negligence.  

     As to the remaining allegations, were this case to involve

directly the sexual relationship between cleric and counsellee,

we might be inclined to consider the reasoning of the court in

MacDonell, 677 A.2d. at 263, which, as noted, permitted a claim

of clergy malpractice, stressing the "bright line between

counselling culminating in a sexual relationship with a

counsellee and other types of harm allegedly resulting from a

failed counselling relationship."  As in Bivin, the MacDonell

court considered that when sexual misconduct is involved, the

fear of treading on doctrinal matters is minimal, and to

establish a standard of care involved "no impenetrable barrier." 

MacDonell, 677 A.2d at 264.     

     However, unlike in Bivin and MacDonell, the sexual liaison

here, while impacting upon the plaintiff, involved his wife, who

is not a plaintiff.  Furthermore, to the extent the plaintiff

alleges mishandling of the transference phenomenon, the Pastor

did so with regard to Linda.  Indeed, the plaintiff concedes in

his brief that the Pastor's sexual liaison with Linda is not the

focal point of his claim of negligent counselling.

     In essence, the plaintiff's complaint alleges that Pastor

Greenquist, while counselling him in accordance with duties

established by church doctrine, breached his duty as a

professional marriage counsellor.  We believe there is an

inherent contradiction in this core allegation which exposes the

problem with claims of malpractice against members of the clergy,

even when couched in terms of professional or psychotherapy

malpractice.

     Nonetheless, the plaintiff urges, relying on the allegations

of his complaint in conjunction with the decision in Horak v.

Biris, 130 Ill. App. 3d 140, 474 N.E.2d 13 (1985), that Pastor

Greenquist was required "to exercise the same professional care

expected of other professionals in the field of psychotherapy." 

In Horak, a licensed social worker counselled the plaintiff on

marital matters while he was engaged in a sexual relationship

with the plaintiff's wife.  The court recognized an action for

social worker malpractice.  However, central to the decision in

that case was that the defendant held himself out as a social

worker licensed by the State of Illinois.  As such, he was

required to exercise the degree of skill possessed by members of

that profession.

     The plaintiff's complaint does not allege that Greenquist is

either a licensed social worker, licensed psychotherapist or a

licensed marriage counsellor or that he held himself out as one. 

Indeed, during the time when the plaintiff's claims accrued, the

statutes in force authorizing the licensing of and the

establishment of standards for practitioners of these professions

specifically exempted religious practitioners from their ambit,

so long as they do not hold themselves out as qualified under the

acts.  E.g. 225 ILCS 55/15(d) (West 1994) (Marriage and Family

Therapy Licensing Act); 225 ILCS 20/4(2) (West 1994) (Clinical

Social Work and Social Work Practice Act).  Furthermore, to the

extent Illinois has, subsequent to the alleged actions involved

in this case, statutorily recognized an action for sexual

exploitation within the confines of a psychotherapeutic

relationship, it has limited recovery under that act to the

victims of the exploitation and, in addition, excluded

"counselling of a religious nature" from the definition of

"psychotherapy."  740 ILCS 140/1(e) (West 1992) (Sexual

Exploitation in Psychotherapy Act).

     Finally, although the plaintiff does allege that Greenquist

mishandled psychotherapeutic principles, such as the transference

phenomenon, he does not allege that Pastor Greenquist had either

formal training in and knowledge of these principles or any

counselling training outside of his training by the defendant

ELCA.  Indeed, the plaintiff's allegations presuppose that a

Pastor is under the same ethical obligations the State imposes

upon therapists it licenses.  We cannot impose such obligations

on a church within the constricts of the first amendment.  That

is the holding of Baumgartner, in which the court refused to

impose the standards of the licensed medical professional upon a

Christian Science practitioner.  Accordingly, we will not uphold

the plaintiff's complaint based upon the Horak decision.

     The plaintiff also urges that our supreme court's decision

in Corgan v. Muehling, 143 Ill. 2d 296, 574 N.E.2d 602 (1991),

permits his claims.  The plaintiff contends that, as in Corgan,

because he alleged that Greenquist held himself out as a

"professional counsellor," Greenquist may be held accountable for

his negligent counselling, generally.  Corgan involved the

allegations of a plaintiff involved in a sexual relationship with

the defendant psychologist.  Even accepting Corgan for the broad

proposition advanced by the plaintiff, we note again that the

allegations of the complaint indicate that Pastor Greenquist's

training as a counsellor was solely under the aegis of ELCA and

was, thus, religious in nature.

     The complaint does allege that the Pastor held himself out

as a "skilled professional" in matters of counselling, but it

also admits that the Pastor counselled in accordance with stated

church doctrine and encouraged members to seek counselling within

the church "before seeking secular professionals."  The plaintiff

alleged that Pastor Greenquist provided marriage counselling to

him in accordance with church doctrine.  That is not the same as

a situation in which a plaintiff alleges that "a particular

church *** also offer[s] purely secular counselling as a service

to members of its congregation or to a broader segment of the

population in need of such services."  Dausch, 52 F.3d at 1433. 

We believe that given the particular facts alleged by the

plaintiff, a trial court would be required to investigate the

nature of counselling, as well as the training of counsellors,

within this particular church.  That is not permitted in Illinois

(Baumgartner v. First Church of Christ, Scientist, 141 Ill. App.

3d 898, 490 N.E.2d 1319 (1986)), or in any other jurisdiction. 

See Dausch, 52 F.3d at 1432 n.2.

     This area requires, as the MacDonell court recognized, that

a bright line be drawn between those claims actionable and those

which impinge on first amendment guarantees.  In the factual

context of this case, we believe that "line" requires us to

uphold the trial judge's ruling.  At core, the plaintiff has

alleged that Pastor Greenquist is a very bad counsellor who tried

during counselling sessions to hide an illicit affair with the

plaintiff's wife.  Yet, according to the complaint, he was

performing the counselling itself in the context of duties

imposed upon him as a cleric by church doctrine.  And, as the

plaintiff concedes, this case is about the counselling.  We

believe that to permit the plaintiff's claims would effectively

erase the bright line espoused by the MacDonell court, a line we

agree must be drawn.  Accordingly, the trial judge did not err in

dismissing the count for psychotherapy malpractice against Pastor

Greenquist.

     As to the plaintiff's allegations of malpractice against

Bishop Hicks, we hold that the plaintiff has not properly alleged

a counselling relationship, let alone an actionable duty.  In

response to the plaintiff's request that Bishop Hicks render

counselling services to him as a result of Pastor Greenquist's

activities, the Bishop responded that the plaintiff should seek

professional counselling.  The plaintiff fails to allege any

facts that support a conclusion that this was a "counselling"

session.  Rather, his complaint centers on the Bishop's refusal

to counsel him.  First, we believe that the allegations clearly

indicate that the plaintiff approached the Bishop within the

context of his duties as the head of the church.  As such, the

claim is clearly non-justiciable.  Furthermore, we fail to

perceive how the Bishop's response is actionable, even if he was

acting in order to effect damage control, as the plaintiff

alleges.  We also conclude that the disciplinary action that

Bishop Hicks subsequently did or did not take with regard to

Pastor Greenquist is, as regards this case, outside any

relationship he had with the plaintiff.  The trial judge properly

dismissed the psychotherapy malpractice claim against Bishop

Hicks.

     The plaintiff also alleges that both Pastor Greenquist and

Bishop Hicks breached a fiduciary duty owed to the plaintiff.  In

the count against the Pastor, the plaintiff assigns, as breaches

of the duty, the same allegations, save the mishandling of the

transference phenomenon, as he did in his count for malpractice. 

That is, that the Pastor "wilfully defrauded" him by undermining

the marital relationship; divulging confidences to Linda; not

revealing his conflict of interest; and rendering advice against

the plaintiff's best interest.

     Under Illinois law, a fiduciary relationship is recognized

to exist when "a special confidence [is] reposed in one who, by

reason of such confidence, must act in good faith and with due

regard to the interests of the person reposing such confidence." 

Estate of Osborn, 128 Ill. App. 3d 453, 455, 470 N.E.2d 1114

(1984).  Such a relationship may exist as a matter of law, "or it

may be the result of a more informal relationship--moral, social,

domestic or even personal in its origin."  Estate of Osborn, 128

Ill. App. 3d at 455.

     Applying this definition in Dausch v. Rykse, the United

States Court of Appeals for the Seventh Circuit held that

Illinois law, in conjunction with the first amendment, prohibited

the recognition of an action for breach of fiduciary duty

premised upon the counselling relationship between a cleric and a

church member with whom the cleric had been sexually involved. 

Dausch, 52 F. 2d at 1438

     The Dausch court reasoned that in order to determine such a

duty would require the court

          "to define a reasonable duty standard and to

     evaluate [the cleric's] conduct against that standard,

     an inquiry identical to that which Illinois has

     declined to undertake in the context of a clergy

     malpractice claim and one that is of doubtful validity

     under the Free Exercise Clause.  It is clear that

     Illinois would not entertain a claim for breach of

     fiduciary obligation under the circumstances alleged

     here."  Dausch, 52 F. 3d at 1438.  

However, other jurisdictions which have faced this question have

had "no difficulty" in concluding that a cleric's sexual activity

with a counsellee or the spouse of a counsellee may be used by

the counsellee as the basis to state a cause of action for breach

of fiduciary duty.  DeStefano v. Grabrian, 763 P.2d 275, 289

(Colo. 1988).  See also MacDonell, 677 A. 2d at 264-65; Sanders

v. Casa View Baptist Church, 898 F. Supp 1169 (N.D.Tex. 1995).    

     Although we agree with the courts in these jurisdictions

that the relationship between a cleric and parishioner reflects

many aspects of a fiduciary one, we hold that under Illinois law,

a contention that a cleric has breached his duty as a fiduciary

is not actionable.  We believe that when a parishioner lodges

such a claim, religion is not "merely incidental" to a

plaintiff's relationship with a defendant, "it [is] the

foundation for it."  H.R.B. v. J.L.G., 913 S.W.2d 92, 99 (Mo.

App. 1995).  The fiduciary relationship is inescapably premised

upon the cleric's status as an expert in theological and

spiritual matters.  The plaintiff's complaint confirms this.

     In lodging his claim for breach of fiduciary duty, the

plaintiff alleged that in divulging confidences to the Pastor, he

relied on the Pastor's "representations concerning his

professionalism, training, skill, and experience, as well as

[his] commitment to God and religion."  We consider it imprudent

for a court to attempt to dissect the secular from the sectarian

in this equation.  While we would consider unlikely the Pastor's

ability to establish that his behavior in this case was

religiously motivated (cf. H.R.B., 913 S.W.2d at 98-99), the

plaintiff's relief lies in other well-recognized causes of

action, such as the count alleging intentional infliction of

emotional distress, which we reinstate, as well as the fraud

count which the trial judge permitted the plaintiff to replead

and which repeatedly finds its way into every allegation of both

malpractice and breach of fiduciary duty raised by the plaintiff. 

Thus, we affirm the dismissal of the counts for breach of

fiduciary duty as against both Pastor Greenquist and Bishop

Hicks.  Furthermore, in light of our holding in this regard, we

affirm the dismissal of counts seven, nine, twelve and thirteen

of the plaintiff's complaint in that they are all claims of

respondeat superior against the church defendants arising out of

the alleged breaches of fiduciary duty by Pastor Greenquist and

Bishop Hicks.  

     The trial judge also dismissed the plaintiff's count

alleging intentional infliction of emotional distress against

Pastor Greenquist.  In order to plead such a claim, the plaintiff

must allege facts establishing that the defendant's conduct was

"extreme and outrageous and that the defendant either intended

his conduct to inflict severe emotional distress or knew that

there was a high probability that the conduct would cause such

distress."  The plaintiff also must allege that the conduct, in

fact, caused severe emotional distress.  McGrath v. Fahey, 126

Ill. 2d 78, 86, 533 N.E.2d 806 (1988).

     A complaint for intentional infliction of emotional distress

may stand "only where the conduct complained of [is] so

outrageous 'as to go beyond all bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civil

community.'"  Pavilion v. Kaferly, 204 Ill. App. 3d 235, 245, 561

N.E.2d 1245 (1990).  We may assess the outrageousness of a

defendant's actions based, in part, upon a "defendant's improper

use of a position of power which gives him the ability to

adversely affect the plaintiff's interests."  Kolegas v. Heftel

Broadcasting Corp., 154 Ill. 2d 1, 22, 607 N.E.2d 201 (1992).

     The plaintiff alleged that he sought counselling "concerning

his failing marriage."  Pastor Greenquist acted in an extreme and

outrageous manner by counselling the plaintiff while the Pastor

was involved with Linda Amato and by counselling in a manner

designed to "covertly undermine" the couple's marriage.  The

plaintiff discovered the relationship between Greenquist and

Linda when he found correspondences the two had been exchanging,

including Christmas and Valentine's Day cards, as well as

"enclosed love letters."  Greenquist told the plaintiff that his

relationship with Linda was "God's will."  The plaintiff

concludes that as a result of the Pastor's actions, he has

suffered "depression, despair, insomnia, anxiety, nervousness and

emotional trauma."

     We believe these allegations satisfy the plaintiff's

pleading burden.  The defendant allegedly used his position to

learn confidential information, which he divulged to Linda in an

effort to destroy the plaintiff's marriage.  The plaintiff has

alleged that the Pastor's actions were intentional and that he

has suffered various and severe emotional distresses as a result. 

Cf. Kolegas, 154 Ill. 2d at 21-25.  Therefore, we vacate the

portion of the trial judge's order dismissing count II of the

plaintiff's complaint.

     The remaining counts are against the church defendants and

sound in respondeat superior based upon the intentional

infliction of emotional distress by Greenquist, as well as

emotional distress occasioned by Bishop Hicks.  Under the

doctrine of respondeat superior, an employer may be liable for

the torts of his servant when such acts are committed in the

course of employment and in furtherance of the employer's

business; however, the employer is not liable if the employee

commits the acts solely for his own benefit.  Giraldi v. Lamson,

205 Ill. App. 3d 1025, 1030, 563 N.E.2d 956 (1990).

     As to the church defendants' liability for Pastor

Greenquist's actions (counts VIII, X and XIV), we hold that the

complaint fails to allege that the Pastor's actions in deceiving

and otherwise counselling the plaintiff were for anything other

than his own benefit.  For instance, paragraph 25 of the common

allegations states, "PASTOR did not reject DUANE'S requests for

counselling or refer said request to an independent third

party***, but rather welcomed the opportunity to counsel DUANE in

order to further his own personal goals."  Furthermore, paragraph

26 of the common allegations states that "PASTOR *** counselled

DUANE against DUANE'S best interests in order to further PASTOR'S

own material goals, to foster and promote his own sexual

gratification, and to further undermine the relationship of his

parishioners."  Because these core factual allegations underlie

all of the plaintiff's respondeat superior counts involving

Pastor Greenquist, the plaintiff cannot establish liability on

this basis.

     Count XI is entitled "respondeat superior-negligent

infliction of emotional distress," and is based upon the actions

of Bishop Hicks.  In stating this claim, the plaintiff

specifically incorporates the allegations against the Bishop in

count V, which was a claim for psychotherapy malpractice.  We

agree with the church defendants that the essence of this claim

is one for respondeat superior based upon psychotherapy

malpractice, a claim which we have already rejected with regard

to Bishop Hicks.  Therefore, that claim may not stand against the

church defendants.

     For all of the forgoing reasons, we affirm the judgment of

the circuit court in dismissing all of the counts in the

plaintiff's second amended complaint, with the exception of count

II for intentional infliction of emotional distress against

Pastor Greenquist, which we reinstate.

     Affirmed in part, vacated in part and remanded for further

proceedings.

     McNamara, J., and Rakowski, J., concur.